UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUNIOR JUMPP, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:20cv138 (KAD) |
| | : | |
| SIMONOW, | : | |
| Defendants. | : | |

## ORDER ON MOTION TO PROCEED *IN FORMA PAUPERIS* AND INITIAL REVIEW ORDER

On January 31, 2020, the plaintiff, Junior Jumpp ("Jumpp"), a pretrial detainee formerly held in the custody of the Department of Correction ("DOC") at New Haven Correctional Center ("New Haven"), filed this civil rights action pursuant to title 42 U.S.C. § 1983 against District Administrator Scott Erfe, Commissioner Rollin Cook, and twenty-three individual DOC employees who work either at Corrigan-Radgowski Correctional Center ("Corrigan") or New Haven Correctional Center. Specifically, Jumpp brings claims of deliberate indifference to his dental needs against dentist Nancy J. Simonow and Dental Assistant Kim Fletchette at Corrigan (the "Corrigan defendants"); and claims of retaliation, excessive force and deliberate indifference to his medical needs against staff at New Haven.[1] *See* ECF No. 18.[2]

In an order dated April 14, 2020, the Court denied his motion for leave to proceed *in forma pauperis* because the three strikes provision of 28 U.S.C. § 1915(g) applies in this case.

---

[1] The New Haven staff named as defendants are: Registered Nurse ("RN") Supervisor Timiki Jackson, Tiara Cheatham, LPN Lynda Carter, RN Louise Marie E. Richardson, RN Gisela ("Gigi") Ballabani, APRN MaryEllen Silva, Warden Allison Black, Lieutenant Aponte, Deputy Warden Denise Walker, Correctional Counselor Dixon, Captain Russell, Lieutenant Crenshaw, Lieutenant Jose Colon, Correction Officer Holness, Correction Officer Daniele, Correction Officer Mazzonna, Correction Officer Makl, Correction Officer Loney, Kitchen Supervisor Michael Phillips, Kitchen Supervisor McClusky, and Kitchen Supervisor Michelle Young (the "New Haven defendants").

[2] On March 15, 2020, Jumpp filed an Amended Revised Complaint to update the proper names of the defendants.

1

However, the Court determined Jumpp's complaint sought only damages against the defendants in their individual capacities, and therefore, Jumpp's action could not satisfy the "imminent danger" standard of § 1915(g)'s "escape hatch" to excuse his payment of the filing fee.[3]  Order, ECF No. 17 at 2-5. The Court permitted Jumpp to file an amended complaint to show that he was in imminent danger of serious physical injury at the time he filed his complaint. *Id.* at 5.

Jumpp subsequently filed an Amended Complaint (filed May 4, 2020) and an Additional Request for Injunctive Relief (filed May 18, 2020) (hereinafter the "Amended Complaint"). ECF Nos. 18 & 19. While Jumpp now seeks both damages and injunctive relief, his Amended Complaint states that he is suing the defendants in their individual capacities only. ECF No. 18 at 1. Because Jumpp is requesting injunctive relief, the Court construes the Amended Complaint most broadly as asserting his claims against the defendants in their official and individual capacities.[4]

The Court will first reconsider whether Jumpp should be allowed to proceed *in forma pauperis* under § 1915 in light of his Amended Complaint, and if so, whether he has stated any plausible claims. For the following reasons, the court will permit Jumpp to proceed *in forma pauperis*.

### *IN FORMA PAUPERIS*

---

[3] *See, e.g., Gipson v. LaBonte*, No. 3:18-CV-1692 (VAB), 2019 WL 1921778, at *3 (D. Conn. Apr. 30, 2019) (finding no imminent harm where complaint sought only damages and no injunctive relief related to his high blood pressure condition).

[4] "'[I]njunctive relief against a state official may be recovered only in an official capacity suit,' because '[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him.'" *Marsh v. Kirshner*, 31 F. Supp. 2d  79, 80 (D. Conn. 1998). Thus, a plaintiff may only seek injunctive relief under Section 1983 against a defendant sued in his or her official capacity. *See Altayeb v. Chapdelaine*, No. 3:16-CV-00067 (CSH), 2016 WL 7331551, at *3 (D. Conn. Dec. 16, 2016).

"To help staunch a 'flood of nonmeritorious' prisoner litigation, the Prison Litigation Reform Act of 1995 (PLRA) established what has become known as the three-strikes rule." *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1723 (U.S. June 8, 2020) (citing *Jones v. Bock*, 549 U.S. 199, 203 (2007)). The three strikes rule "generally prevents a prisoner from bringing suit *in forma pauperis* (IFP)—that is, without first paying the filing fee—if he has had three or more prior suits 'dismissed on the grounds that [they were] frivolous, malicious, or fail[ed] to state a claim upon which relief may be granted.'" *Id.* (citing 28 U.S.C. § 1915(g)).

When enacted, the PLRA amended the statute governing proceedings filed IFP, 28 U.S.C. § 1915, by adding the following subsection:

> (g) In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

In the context of this statutory scheme, the imminent danger exception is designed to provide "a *safety valve* for the three strikes rule." *Malik v. McGinnis,* 293 F.3d 559, 563 (2d Cir. 2002) (emphasis added and internal quotations omitted) (quoting *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir. 2001)). "Its unmistakable purpose is to permit an indigent three-strikes prisoner to proceed IFP in order to obtain a judicial remedy for an imminent danger." *Pettus v. Morganthau*, 554 F.3d 293, 297 (2d Cir. 2009).

As previously discussed in the Court's prior order, Jumpp has had more than three cases dismissed as frivolous. *See, e.g., Jumpp v. Marinelli*, 3:13cv615 (AWT) (dismissed June 28, 2013); *Jumpp v. Reyes*, 3:13cv637 (AWT) (dismissed May 13, 2013); *Jumpp v. DOC,*

3:13cv505 (AWT) (dismissed May 13, 2013). Because the so-called three strikes provision applies here, Jumpp may not bring this action without paying the filing fee absent allegations of "imminent danger of serious physical injury." *See Pettus*, 554 F.3d at 297 ("indigent three-strikes prisoner [may] proceed IFP in order to obtain a judicial remedy for an imminent danger"). In this regard, Jumpp must meet two requirements: (1) the imminent danger of serious physical injury he alleges is fairly traceable to the unlawful conduct alleged in the complaint, and (2) a favorable judicial outcome would redress the injury. *See id.* at 296-97. In addition, the danger of imminent harm must be present at the time the complaint is filed. *See id.* at 296. As the Second Circuit explained:

> Section 1915(g)'s exception "can serve its role as an escape hatch for genuine emergencies only if understood reasonably." *Lewis v. Sullivan,* 279 F.3d 526, 531 (7th Cir.2002). Absent some nexus between a complaint's claims and its allegation that a plaintiff is under imminent danger of serious physical harm, the injury-in-fact that Congress so carefully excepted from the general requirement that a three-strikes litigant pay his filing fees could go unaddressed by the litigation—a result clearly contrary to the *raison d'être* of the exception itself. When, in contrast, a complaint seeks to redress an imminent danger that is fairly traceable to allegedly unlawful conduct complained of in the pleading, the three strikes litigant has shown that he fits squarely within § 1915(g)'s "escape hatch" and that payment of a filing fee should be excused.

*Id.*

Jumpp's Amended Complaint has retained his allegations asserting that he has been denied his seizure medicine and his inhaler at New Haven; that supervisory officials had indicated that they would not remedy any denial of medical treatment; that several staff members had expressed that they did not care if he died; that his mental health needs have been ignored; that he has been served food that causes him harm and an allergic reaction; that he has been the subject of excessive force; and that he is the subject of retaliatory acts (including denial of treatment for his medical needs by medical and custody staff at New Haven) because he has filed

prior legal actions against Warden Black and Commissioner Cook.[5] However, unlike his prior complaints filed in this action, the instant Amended Complaint alleges that the deliberate indifference is ongoing and he now has included a request for injunctive relief so that he can receive his "health medications" and treatment for his medical conditions. ECF No. 18 at ¶ 26, p. 24. The factual allegations of Jumpp's Amended Complaint suggest that the New Haven staff, including supervisors, are acting to deny him necessary medical treatment and medication, including medication to treat his blood pressure and seizure conditions. Thus, Jumpp's Amended Complaint raises a plausible inference that at the time he filed this action and to the present date, Jumpp has faced imminent physical harm at least stemming from the alleged New Haven staffs' failure to provide him his prescribed blood pressure and/or seizure medications. Jumpp has shown that this action satisfies §1914(g)'s "escape hatch" because injunctive order requiring that he receive medications and medical treatment for his prescribed blood pressure and seizure would redress the imminent harm caused by the alleged ongoing deliberate indifference to his medical needs.

Upon reconsideration, and upon review of the Amended Complaint the Motion to Proceed *informa pauperis*, is GRANTED.[6]

**INITIAL REVIEW**

The Court will conduct an initial review of all claims within the Amended Complaint because a plaintiff who qualifies for proceeding *in forma* pauperis on the basis of

[5] Jumpp also asserts that Lieutenant Colon, who is a victim in Jumpp's pending criminal case, threatened to shoot him and his family.

[6] Jumpp's Amended complaint has also added allegations about incidents that occurred after he filed his original complaint. Although the Court does not consider these allegations in its analysis of whether he faced imminent harm at the time he filed this action, the Court will consider these allegations in its initial review as the defendants have yet to be served. *See id.* at ¶¶ 24, 25; ECF No. 19; *See also* Fed. R. Civ. P. 15.

the imminent danger exception can proceed with all claims asserted in the complaint. *Chavis v. Chappius*, 618 F.3d 162, 171–72 (2d Cir. 2010).

**Standard of Review**

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint must include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

**FACTUAL ALLEGATIONS**

In this action, Jumpp is alleging the same deliberate indifference to his dental needs claims that he asserted in his action, *Jumpp v. Thibodeau*, Dkt. 3:19cv1723. In that case, he

alleged claims of retaliation and deliberate indifference to his medical needs and safety at Corrigan; after Jumpp attempted to amend his original complaint to add his dental claims against defendants Simonow and Fletchette, the Court severed his dental claims under Federal Rule of Civil Procedure 20 because such claims were wholly unrelated to the claims alleged in his original complaint.[7] *Jumpp v. Thibodeau*, 2019 WL 6828323, at *1-2 (D. Conn. Dec. 12, 2019). Here, Jumpp has attached the Court's prior Order severing his dental claims from the claims asserted in his prior case.

The Court recounts the facts alleged in the instant complaint.[8]

Deliberate Indifference to Dental Needs At Corrigan

On July 11, 2019, Jumpp was seen by Dentist Nancy J. Simonow and Dental Assistant Kim Fletchette for an on-going tooth issue, and for replacement of a filling that had fallen out a few months earlier at Corrigan. Compl., ECF No. 18 at p. 8. They filled his tooth and told Jumpp that he should feel better when the medication wore off. *Id.* The next day, Jumpp experienced severe dental pain that prevented him from eating or sleeping. *Id.* He submitted a request to the dental unit to be re-checked. *Id.* On July 17, 2019, he submitted a second request but still was not seen. *Id.* On July 21, 2019, fearing an infection, Jumpp wrote specifically to defendant Fletchette. *Id.* However, he was not seen or provided with any pain medication. *Id.* at p. 9. Jumpp has still not been seen. *Id.*

Deliberate Indifference and Retaliation at New Haven Correctional Center

---

[7] The Court instructed Jumpp that he could pursue his dental claims in a separate case. *Id.*

[8] With respect to the dental claims, Jumpp has alleged the same facts in both actions.

On December 11, 2019, after returning from court, Jumpp was in the Admitting and Processing Room, when he informed Correction Officer Holness that his chest was tight and he needed an inhaler. *Id.* at p. 16 ¶ 9. Correction Officer Holness told him, "You get shit and I hope you die because I am not calling medical." *Id.* Jumpp was able to receive an inhaler from another Correction Officer who had his court inhaler. *Id.*

On December 13, 2019, Jumpp informed Captain Russell that he was thinking about killing himself and had plans for "cutting up." *Id.* at p. 13 ¶ 2. Captain Russell responded that he could not do anything for Jumpp and walked off. *Id.*

On December 14, 2019, Jumpp informed Lieutenant Cranshaw and Correction Officer Daniele that he had been having suicidal thoughts and that he had swallowed a razor blade. *Id.* at p. 14 ¶ 3. They said, "Oh, kill yourself." However, they called Nurse Paul and told him Jumpp had requested an inhaler. *Id.* After Jumpp told Nurse Paul he had swallowed a razor blade, Jumpp was sent to the hospital for an x-ray. *Id.* After the x-ray came back positive for the razor blade, he was admitted for four to five days and returned to the facility. *Id.*

On December 20, 2019, Jumpp was housed at the New Haven Fox Unit. *Id.* at p. 13 ¶ 1. Jumpp questioned Nurse Supervisor Jackson about why she had instructed nurses not to give him his medication for strokes and seizures. *Id.* She continued to deny him medication with the exception of providing him with an inhaler. *Id.* She also expressed that she did not care if he died. *Id.*

On December 24, 2019, Warden Black toured Jumpp's unit with Deputy Warden Walker. *Id.* at p. 14 ¶ 4. Jumpp asked her questions about receiving disciplinary tickets for the incident with the razor blade. *Id.* She responded by telling him that Commissioner Cook told her that Jumpp was a "piece of shit" and was possibly suing him, and that Warden Black

should ensure that his stay at New Haven was "hard." *Id.* She indicated that she would not be dismissing the disciplinary tickets. *Id.*

On December 26, 2019, Jumpp informed Lieutenant Aponte that he was having issues breathing and asked for his inhaler. *Id.* at p. 15 ¶ 5. She responded that he "got shit" and should use his sleep apnea machine to ease chest tightness. *Id.*

On the morning of December 27, 2019, Lieutenant Champion escorted him to the medical unit due to Jumpp's nose bleeds allegedly caused by denial of his medication and failure to clean his sleep apnea machine. *Id.* ¶ 7. Nurse Supervisor Jackson found his blood pressure was high (which Jumpp asserts is due to his lack of medication), but she still failed to provide him with appropriate medication to bring down the blood pressure. *Id.*

In the afternoon of December 27, 2019, Deputy Warden Walker came to the unit and took him to the dayroom to inform him that the denial of his medical treatment would continue because he is an unsentenced inmate. *Id.* at ¶ 6. After Jumpp responded that the denial of medical treatment was retaliatory, she stated, "Mr. Jumpp, you got it." She indicated she would not instruct her staff to "stop denying" him medical treatment because "this is what [he] get[s] for suing her Warden Black and Commissioner Cook." *Id.* Jumpp asserts Commissioner Cook has knowledge of these issues but fails to remedy the situation. *Id.*

On December 29, 2019, Jumpp asked the block officer to call the medical unit because he had had a seizure and was experiencing light headedness. *Id.* at p. 16 ¶ 10. Lieutenant Cranshaw, who was touring the unit, told him he could not see medical staff; Lieutenant Cranshaw also told the block officer not to call the medical unit and to ignore Jumpp because he did not want to do any incident report packages. *Id.*

That same day, Correction Officer Elliot called the medical unit because Jumpp had requested his inhaler. *Id.* at ¶ 8. Nurses Carter and Richardson refused to provide him with an inhaler and told him that he was not "getting shit." *Id.* They argued with him before giving him the inhaler; during the delay in receiving the inhaler, Jumpp experienced chest tightness. *Id.*

On December 30, 2019, District Administrator Erfe and Deputy Warden Walker toured New Haven. *Id.* at p. 17 ¶ 11. Jumpp informed Erfe of his "issues and the denial of medical attention." *Id.* Erfe responded, "You['re] suing Commissioner Cook and Mr. Cook made it clear that you get nothing and base[d] on that I'll not talk to medical or any other staff[.]" Both Deputy Warden Walker and District Administrator Erfe stated that they "had nothing" for Jumpp until he withdrew his lawsuit against Commissioner Cook. *Id.*

In the afternoon of December 30, 2019, he asked Counselor Dixon for his inhaler. *Id.* at ¶ 13. She refused to call for an inhaler, and Jumpp had to use his sleep apnea machine to gain relief from his chest tightness. *Id.* Jumpp also had a seizure but Counselor Dixon did not call any code. *Id.* She later indicated that she did not call a code because she knew his seizure would stop and did not want to do paperwork. *Id.*

That same day, Jumpp saw Nurse Supervisor Cheatham at the medical unit. *Id.* at ¶ 12. After he informed her about his lack of medical treatment, she stated that she had told her staff not to "give him shit," and that she hoped he had a stroke. *Id.*

On January 1, 2020, Correction Officers Makl and Mazzonna were in Jumpp's unit when he had a seizure. *Id.* at p. 18 ¶ 14. Although they saw Jumpp passed out on the floor shaking, they failed to call a Code White. *Id.* Jumpp later asked them why they had failed to call the Code White. *Id.* Correction Officer Makl stated, "Dude, come on it['s] New Years. We aint trying to do any paperwork." Correction Officer Mazzonna stated, "Dude, what's the big

deal. We knew you was going to be fine after it stopped. . . .You aint died. What's the deal."
*Id.* They refused to permit Jumpp to see medical staff and told him that he was fine and should
take a nap. *Id.*

That day, Correction Officer Mazzonna passed out the dinner trays. *Id.* at ¶ 15. After
Jumpp questioned him about his earlier conduct, Mazzonna slammed Jumpp's hand and arm in
the food trap. *Id.* Although Jumpp was bleeding, Correction Officer Mazzonna refused to call
the medical unit. *Id.* Jumpp is still experiencing discomfort from this injury. *Id.*

On January 2, 2020, Jumpp was brought to the medical unit because of nose bleeds. *Id.*
at p. 19 ¶ 16. Nurse Richardson refused to look at his swollen hand, stating, "You're not here
for that." *Id.* Although she saw his blood pressure was high, she failed to provide him with the
appropriate medication for bringing down his blood pressure. *Id.*

On January 3, 2020, Kitchen Supervisors Young and McClusky wrapped up a tray with
his name on it that stated, "No Tomato, No Onions." *Id.* at ¶ 17. However, the meal had onion
powder on the fish patty and rice. *Id.* Jumpp then had an allergic reaction with throat swelling,
which caused him breathing difficulty. *Id.* When he saw the kitchen staff in the hall, they were
laughing and asked him whether he had enjoyed the tray. *Id.* Jumpp has a current diet order
stating that he should not be given tomatoes or onions. *Id.*

On January 12, 2020, Kitchen Supervisor Young sent him a breakfast tray with a meal
that smelled like cleaning liquid and tasted odd. *Id.* at P. 20 ¶ 18. His stomach started to hurt
requiring that he be seen by medical staff. *Id.* When Kitchen Supervisor Young was requested to
make him another meal, she refused. *Id.* Kitchen Supervisor Young stated that the food tray had
been made "specifically for him" and that Jumpp would not have to worry about contaminated
food if he stopped being an ass.

At 12:30 AM on January 15, 2020, Jumpp told Correction Officer Loney that he was hearing voices and was suicidal. *Id.* at ¶ 19. Correction Officer Loney stated that he would not call the medical unit due to lack of mental health staff members; he also indicated that if Jumpp had a sheet around his neck, he would call the Code. *Id.* Shortly thereafter, Lieutenant Colon stopped at Jumpp's door and told him that he would not call medical staff for him and advised him to go to sleep. *Id.* Two hours later, Jumpp told another correction officer that he needed his inhaler, and Nurse Paul arrived with an inhaler. *Id.* Jumpp informed Nurse Paul that he was suicidal. *Id.* After Jumpp was brought to the medical unit, Jumpp told Lieutenant Colon that he was going to bang his head after placement on suicide watch. *Id.* Lieutenant Colon responded that he would do nothing until Jumpp actually started banging his head. *Id.* at p. 21 ¶ 19. Jumpp did bang his head, which caused swelling the next day. *Id.* He was then placed in full point restraints. *Id.*

After removal from this status, Jumpp found that all of his personal property was gone, and there was no packing slip of his property.[9] *Id.*

On January 16, 2020, Kitchen Supervisors Young and McClusky sent Jumpp a lunch with onions, which caused him to be rushed to the medical unit due to his allergic reaction. *Id.* at ¶ 20.

At the medical unit, RN Ballabani saw that Jumpp's throat was swollen but failed to provide him with any medication to treat the condition. *Id.* Jumpp was put under observation for six hours until the swelling went down. *Id.*

---

[9]Jumpp alleges that Lieutenant Colon must have thrown away or given away his property to retaliate against him because Colon is an alleged victim in Jumpp's pending criminal case. *Id.*

On January 18 and 19, 2020, Jumpp talked to Kitchen Head Manager Phillips about his allergic reaction to the food. *Id.* at p. 22 ¶ 22. In response, Phillips told him that everyone would be happy if he died and requested that he leave. *Id.*

On January 20, 2020, Lieutenant Colon stopped at Jumpp's door and threatened to shoot Jumpp and kill his family. *Id.* at ¶ 21.

On January 22, 2020, Jumpp went to the medical unit for bloodwork when he saw APRN Silva. *Id.* at ¶ 23. He told her that he had not been receiving the medication as prescribed. *Id.* She stated that she did not care and that she would see him when she was ready. *Id.* She also indicated that he would get "nothing" because of his lawsuits suing her workers. *Id.*

On January 22, 2020, Kitchen Supervisor McClusky sent him a dinner tray with chopped onions, despite McClusky's knowledge of the diet order providing that Jumpp cannot eat onions or tomatoes. *Id.* at ¶ 22. Jumpp did not eat the meal. *Id.*

On April 28, 2020, Jumpp told Lieutenant Colon that he was having breathing issues and needed his inhaler. *Id.* at p. 23 ¶ 24. However, Lieutenant Colon refused to call the medical unit and told him that he was a "piece of shit" and that he should die. *Id.* Jumpp had to use his sleep apnea machine to ease the tightness of his discomfort. *Id.*

On April 29, 2020, a kitchen supervisor sent him a dinner tray with ground up chicken and bones that caused him to have to seek medical attention. *Id.* at ¶ 25. The kitchen staff stated that he should die and let him know that their conduct was intentional as they continue to violate his allergy order. *Id.* Jumpp still has bone in his throat, which causes him pain. *Id.*

Medical officials and supervisors continue to deny him medications that have been deemed necessary for his medical conditions. *Id.* at ¶ 26.

13

On May 8, 2020, APRN Silva discontinued Jumpp's food allergy order with respect to raw onions and tomatoes; she instructed the kitchen staff that they could provide Jumpp food with tomatoes and onions; and she instructed her nursing staff members not to provide Jumpp with any of his medications. ECF No. 19 at p. 1. As a result, Jumpp has allegedly not received any medications or eaten any food due to concern about his allergies. *Id.*

On May 11, he was escorted to the medical unit by Officer Flowers due to chest tightness. *Id.* He was seen by Nurse Henderson, who found Jumpp's blood pressure to be extremely high. *Id.* However, APRN Silva came out of her office and told the nurse to send him back to his unit because he was "a piece of shit." *Id.* APRN Silva did not address his medical issues. *Id.* at p. 2.

His chest tightness was potentially caused by the fact that he has not had an inhaler since May 8, 2020, and his blood pressure is high due to his lack of medication. *Id.*

In the afternoon on May 12, 2020, Jumpp went to the medical unit due to a mental health emergency where he was seen by Nurse Supervisor Jackson and Ms. Michelle. *Id.* at p. 3. He informed them that he had been having suicidal thoughts and that he had intentions of self-harm due to his mistreatment by medical and food services staff. *Id.* They both told him to leave and sent him back to his cell. *Id.*

Later that day, Jumpp swallowed Triple A batteries and a sharp piece of metal; he reported this to a lieutenant, who immediately called the medical unit and instructed a correction officer to escort him to the medical unit, where he was evaluated by Nurse Supervisor Jackson. *Id.* She yelled at Jumpp and told him that she would not "do shit" for him and that she hoped that the battery blew up in his stomach. *Id.* She sent him back to his unit

14

without treatment. *Id.* Jumpp reported this treatment to the lieutenant and correction officer in his unit, who told him there was nothing they could do as custody rather than medical staff. *Id.*

That evening, Correction Officer Rodriguez called the medical unit to inform them that Jumpp was having stomach pain and cramps. *Id.* Nurse Supervisor Jackson instructed them to tell Jumpp to drink water and lie down, and she provided no medical attention. *Id.* Later, Correction Officer Shepard called the medical unit to tell them that Jumpp was having cramps and discomfort. *Id.* Nurse Paul responded that Nurse Supervisor had informed her about the situation and that Jumpp should drink some water and lie down. *Id.* Jumpp is allegedly still in pain and has not had an x-ray. *Id.*

**Discussion**

The Court construes Jumpp's Amended Complaint as alleging (1) Fourteenth Amendment violations arising out of deliberate indifference to his serious medical needs due to the failure to provide him with his seizure medication and treatment, failure to provide him with an inhaler, failure to provide him mental health treatment, failure to provide him treatment for his arm injury, failure to provide him with meals that did not cause harm to his health and safety, and failure to provide him dental care (at Corrigan); (2) a Fourteenth Amendment violation arising out of the use of excessive force; (3) a Fourteenth Amendment violation of his due process rights based on the destruction of his property; and (4)First Amendment retaliation claims.

 The Court first reviews the plausibility of his claims against the New Haven defendants because these claims comprise the majority of his claims asserted in his Amended Complaint.

**Deliberate Indifference at New Haven**

15

Claims of pretrial detainees are evaluated under the Fourteenth Amendment Due Process

Clause. In *Darnell v. Piniero*, 849 F.3d 17 (2d Cir. 2017), the court considered a conditions of

confinement claim under the Fourteenth Amendment. *Id.* at 30. The court suggested, however,

that the same standard would apply to all due process claims by pretrial detainees, not just

conditions of confinement claims. *Id.* at 33 n.9 ("deliberate indifference means same thing for

each type of claim under the Fourteenth Amendment"). Following *Darnell,* the court applied

this standard to a variety of deliberate indifference claims. *See, e.g., Valdiviezo v. Boyer*, 752 F.

App'x 29, 32-33 (2d Cir. 2018) (*Darnell* standard applies to claims for deliberate indifference to

serious medical needs).

To demonstrate the required constitutional deprivation to state a claim for deliberate

indifference to serious medical needs, a pretrial detainee must first show that his medical need

was "sufficiently serious*." See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This inquiry "requires the court to examine how

the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will

likely cause the prisoner." *Id.* A "sufficiently serious" deprivation can exist if the plaintiff suffers

from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain.

*See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550,

553 (2d Cir. 1996). A medical condition may not initially be serious, but may become serious

because it is degenerative and, if left untreated or neglected for a long period of time, will "result

in further significant injury or the unnecessary and wanton infliction of pain."

*Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000). The Second Circuit has identified

several factors that are "highly relevant" to the question of whether a medical condition is

sufficiently serious, including "an injury that a reasonable doctor or patient would find important

16

and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

In addition, under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant- official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

Seizures and High Blood Pressure

Jumpp alleges that Nurse Supervisor Jackson, Nurse Richardson, and APRN Silva acted with deliberate indifference by denying him treatment and medication for his seizure disorder and high blood pressure; and that Counselor Dixon, Correction Officer Makl and Correction Officer Mazzonna failed to call for medical assistance when he experienced seizures.

Both seizure disorders and high blood pressure can constitute sufficiently serious medical conditions so as to implicate the 14th Amendment. *See Milner v. Black*, 2016 WL 7104247, at *3 (D. Conn. Dec. 5, 2016) (seizure disorder); *Sloley v. Seeley*, 2018 WL 6582828, at *2 (N.D.N.Y. Dec. 14, 2018) (high blood pressure). For purposes of this initial review, the Court finds that Jumpp has sufficiently alleged plausible Fourteenth Amendment deliberate indifference claims based on defendants Nurse Supervisor Jackson, Nurse Richardson and APRN Silva's failure to provide him treatment and medication for his seizure disorder and high blood pressure; and Counselor Dixon, Correction Officer Makl and Correction Officer Mazzonna's deliberate indifference to his need for medical staff attention due to his seizures. The Court will permit these claims to proceed beyond initial review.

Inhaler/Chest Tightness

Jumpp alleges that he required his inhaler when he experienced breathing problems and chest tightness, which also may be considered a sufficiently serious condition to trigger 14th Amendment protections. *See Holness v. Gagne*, 2019 WL 1789907, at *6 (D. Conn. Apr. 24, 2019) (Holness's breathing problems also constitute a serious medical need).[10] He asserts that defendants Lieutenant Aponte, Lieutenant Colon, Correction Officer Holness, Counselor Dixon, APRN Silva, and Nurses Carter and Richardson all denied him, or delayed his access to, an inhaler while he was experiencing breathing issues and chest tightness. These allegations are sufficient to permit Jumpp's claim of Fourteenth Amendment deliberate indifference to his medical needs to proceed against Lieutenant Aponte, Lieutenant Colon, Correction Officer Holness, Counselor Dixon, APRN Silva, and Nurses Carter and Richardson. *See Holness v. Savoie*, 2019 WL 6700187, at *4 (D. Conn. Dec. 9, 2019).

Suicidal Acts and Ideation

He alleges that Captain Russell, Lieutenant Colon, and Correction Officer Loney refused to call for medical assistance when he expressed suicidal thoughts; that Lieutenant Cranshaw and Correction Officer Daniele failed to provide him with medical assistance after he informed them that he had swallowed a razor blade; and that Nurse Supervisor Jackson denied him mental health care and medical attention after he informed her that he had suicidal thoughts and intent to commit self-harm and then allegedly swallowed batteries and a sharp metal object.

---

[10] The Court notes that the plaintiff in *Holness* is named Junior Jumpp Holness, which appears to be another name used by the instant plaintiff Junior Jumpp. In support of his assertion that he has an objectively serious need for an inhaler, Jumpp cites to the initial review order in *Holness v. Gagne*, Dkt. 3:18-CV-1752, ECF No. 75. *See* Compl., ECF No. 18, at p. 3.

For purposes of this initial review, the Court takes these allegations as true and assumes that they raise objectively serious medical needs based on mental health and physical conditions. *See Holness v. Gagne*, 2019 WL 6683058, at \*5 (D. Conn. Dec. 6, 2019) (diagnoses of schizophrenia, PTSD and emotional distress and swallowed razor blade constituted serious medical conditions); *see also Loadholt v. Lape*, 2011 WL 1135934, at \*3 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted*, 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011) (finding "allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious."). Because Jumpp has sufficiently alleged that he had informed these defendants of a substantial risk of harm but they intentionally denied him medical attention despite knowing of that risk, the court will permit Jumpp's claims of deliberate indifference to proceed against Captain Russell, Lieutenant Colon, Correction Officer Loney, Lieutenant Cranshaw, Correction Officer Daniele, and Nurse Supervisor Jackson.

<u>Arm Injury</u>

Plaintiff alleges that Correction Officer Mazzonna failed to call for medical assistance after his arm was injured in the food trap, and that Nurse Richardson refused to provide him treatment for his arm injury after he showed it to her. He also alleges that he continues to experience discomfort and pain due to this injury. Although the allegations regarding the extent of the injury and pain are sparse, the court finds that Jumpp has alleged that Correction Officer Mazzonna and Nurse Richardson acted intentionally to ignore Jumpp's serious medical need. The court will permit this claim to proceed beyond initial review for further development.

<u>Food Allergies</u>

Jumpp alleges that the Kitchen Supervisors Young and McClusky disregarded his known

food allergy to onions by providing him meals with onions that caused his throat to swell up despite their knowledge of the diet order; that Nurse Ballabani failed to provide him with medication after his throat became swollen from eating food with onions; and that APRN Silva discontinued his food allergy order and instructed the kitchen staff that they could provide Jumpp with foods that cause an allergic reaction.

The court assumes for purposes of this initial review that Jumpp's food allergy was sufficiently serious as it could become life-threatening because it causes him difficulty breathing when his throat swells. *Chavis v. Kienert*, 2005 WL 2452150, at *23 (N.D.N.Y. Sept. 30, 2005) (recognizing that food allergies can become life-threatening but finding food allergy causing hive attacks not sufficiently serious). Because Jumpp has alleged that he had a specific diet food order concerning his allergy, the Court finds Jumpp has sufficient allegations to raise an inference that Kitchen Supervisors Young and McClusky intentionally disregarded Jumpp's known food allergy by providing him meals with onions.

With respect to Nurse Ballabani, Jumpp complains that she put him under observation for six hours rather than providing him with medication to bring down the swelling. However, Jumpp's allegations do not raise an inference that RN Ballabani failed to provide him medical attention. Instead, his allegations reflect that his swelling subsided and that he disagreed with Nurse Ballabani's decision to put him on observation status rather than provide him with medication. However, "[a] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Estelle*, 429 U.S. at 106–07)); *Chance*, 143 F.3d at 703 ("mere disagreement over the proper treatment does not create a constitutional claim"). Accordingly, the court finds the claim against Nurse Ballabani is not plausible and must be dismissed under 28 U.S.C. § 1915A(b)(1).

Jumpp has alleged that APRN Silva acted maliciously when she discontinued his allergy diet order and instructed the kitchen staff that they could provide Jumpp with these foods. Although APRN Silva may have a legitimate reason for her conduct, the court must construe Jumpp's allegations most favorably on initial review. Accordingly, the court will permit this claim to proceed against APRN Silva for further development.

Other Food Claims

Jumpp alleges that he received a meal a breakfast tray from Kitchen Supervisor Young with a meal that smelled like cleaning liquid and tasted odd, and that his stomach later hurt requiring that he be seen by medical staff. He has also alleged that an unnamed kitchen supervisor provided him with a dinner tray with ground up bones that caused him to seek medical attention and that he still experiences discomfort from a bone stuck in his throat. He maintains that kitchen officials later stated that he should die.

Both pretrial detainees and sentenced prisoners are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted). Generally, a single incident of contaminated food does not rise to the level a constitutional violation without allegations that the quality and preparation of the food fell so short of basic standards that the food posed an unreasonable risk of serious damage to a plaintiff's health. *See Roundtree v. City of New York*, No. 15-CV-8198, 2018 WL 1586473, at *8 (S.D.N.Y. Mar. 28, 2018).

Jumpp's allegations concerning the breakfast prepared by Kitchen Supervisor Young suggest that the meal was unappetizing but not that the meal fell so short of basic standards that the food posed an unreasonable risk of serious damage to plaintiff's health. Jumpp has not

alleged that he experienced anything more than a stomachache or that his visit to the medical unit revealed that the food posed an unreasonable risk to his health.

As to the allegations concerning the chicken ground up with bones, the court notes that Jumpp has not alleged that any of the defendants included in the case caption were personally involved in this incident. The court considers only claims alleged against the defendants listed in the case caption as provided in Federal Rule of Civil Procedure 10(a). *See* Fed. R. Civ. P. 10(a) ("title of the complaint must name all the parties"); *see also Thompson v. Hartford Cty. Med. Dep't*, No. 3:19-CV-1983 (VAB), 2020 WL 2198096, at *3 (D. Conn. May 6, 2020) (considering case to be brought only against defendants named in case caption). Because a defendant's personal involvement in an alleged constitutional violation is a prerequisite to hold a defendant liable for an award of damages under § 1983, Jumpp has not sufficiently alleged a claim of Fourteenth Amendment deliberate indifference against any of the named defendants based on being served this meal of chicken ground with bones. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

Accordingly, these two claims concerning his meals will be dismissed as not plausible.

Supervisory Officials

Jumpp's Amended Complaint raises claims of supervisory liability for the Fourteenth Amendment violations based on the deliberate indifference to his medical needs against Commissioner Cook, Warden Black, District Administrator Erfe, Deputy Warden Walker, Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, and Kitchen Head Manager Phillips.

A defendant cannot be held personally liable for a constitutional violation by other defendants simply based on a "high position of authority in the prison system." *Wright v. Smith*,

21 F.3d 496, 501 (2d Cir. 1994). Moreover, a general allegation that a defendant failed to

supervise subordinates does not establish personal involvement without a factual connection

between the defendant's alleged failure and the alleged resulting harm to the plaintiff.

*See Samuels v. Fischer*, 168 F. Supp. 3d 625, 639 (S.D.N.Y. 2016) (citing cases). To

demonstrate the personal involvement of a supervisory official, Jumpp is required to plead facts

alleging at least one of the following:

> the defendant participated directly in the alleged constitutional violation, (2) the defendant,
> after being informed of the violation through a report or appeal, failed to remedy the wrong,
> (3) the defendant created a policy or custom under which unconstitutional practices occurred,
> or allowed the continuance of such a policy or custom, (4) the defendant was grossly
> negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant
> exhibited deliberate indifference to the rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted). Jumpp must also establish

that the supervisor's actions were the proximate cause of the plaintiff's constitutional

deprivation. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir. 2002) (plaintiff must show "an

affirmative causal link" between the supervisor's involvement and the constitutional injury.).

Jumpp has alleged in conclusory terms that Commissioner Cook was aware of the New

Haven staff failure to provide him with medical treatment, Jumpp he has not alleged that he

notified Commissioner Cook through letters, grievances or even verbal communication of the

alleged deliberate indifference to his medical needs and health. He has, however, attached an

inmate request form addressed to Commissioner Cook, complaining about mice in the kitchen

contaminating the food served to inmates, the low food portions served to inmates and Warden

Black's policies regarding recreation; ECF No. 18 at 100; and a letter that he sent to

Commissioner Cook dated January 1, 2020, in which he recounts that he was not allowed to be

seen by the medical unit and tested after he had contact with some blood due to an assault in the

day room. ECF No. 18 at 101. Nevertheless, these materials do not establish that Commissioner Cook had any awareness of the alleged staff deliberate indifference to his medical needs related to his seizures, blood pressure, breathing issues, mental health needs, acts of self-harm, arm injury or food allergies.

Likewise, there is no indication that Warden Black was aware of the alleged deliberate indifference to his medical needs. Jumpp has attached two inmate request forms addressed to Warden Black that concerned his disciplinary ticket and his housing, respectively, but do not suggest that Warden Black had awareness of the alleged staff deliberate indifference to Jumpp's medical needs but failed to take remedial action. ECF 18 at 49, 72. Thus, the Court will not permit Jumpp's claims of deliberate indifference to his medical needs to proceed against either Warden Black or Commissioner Cook on the basis of supervisory liability.

However, Jumpp has alleged that he discussed the denial of medical treatment with Deputy Warden Walker and District Administrator Erfe, who both allegedly indicated that they would take no steps to remedy the staff conduct. Likewise, Jumpp has alleged that Nurse Supervisor Jackson, Nurse Supervisor Cheatham, and APRN Silva held supervisory positions and had notice of the staff failure to afford Jumpp medical care but expressed their intention not to remedy the situation. In fact, Jumpp's allegations indicate that these supervisors instructed their staff to deny Jumpp medical care. Jumpp has also alleged that that he informed Kitchen Head Manager Phillips about his problem with the kitchen staff providing him with food containing onions, but that Philips responded by telling Jumpp that everyone would be happy if died and telling him to leave. Thus, Jumpp's Fourteenth Amendment deliberate indifference claims may proceed against District Administrator Erfe, Deputy Warden Walker,

Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, and Kitchen Head

Manager Phillips based on their supervisory liability.

**Excessive force**

Jumpp's allegation that Correction Officer Mazzonna slammed his arm in the food trap

raises a claim of use of excessive force under the Fourteenth Amendment.

The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the

use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466,

2473 (2015). A plaintiff may prevail by showing "that the force purposely or knowingly used

against him was objectively unreasonable." *Id.* The objective reasonableness of the force used

depends on four factors: "(1) the need for force, including the threat reasonably perceived by the

officer and whether the plaintiff was actively resisting, (2) the relationship between the need and

the degree of force used, (3) the extent of the plaintiff's injury, and (4) any effort made by the

officer to temper or to limit the amount of force." *Abujayyab v. City of New York*, 2018 WL

3978122, at *6 (S.D.N.Y. 2018) (citing *Edrei v. Maguire*, 892 F.3d 525, 537-38 (2d Cir. 2018)).

Here, Jumpp has plausibly alleged that Mazzonna used excessive force to cause him injury

without any legitimate justification. Accordingly, Jumpp's claim for the use of excessive force

may proceed against Correction Officer Mazzonna.

First Amendment Retaliation at New Haven

Jumpp makes several claims of retaliation against New Haven staff.

Courts treat prisoner retaliation claims "with skepticism and particular care, because

virtually any adverse action taken against a prisoner by a prison official—even those otherwise

not rising to the level of a constitutional violation—can be characterized as a constitutionally

proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation

omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotations and citation omitted). To state a claim for retaliation, an inmate must demonstrate three elements: (1) he engaged in protected speech or conduct, (2) the defendants took an adverse action against him, and (3) there was a causal connection between the protected speech and the adverse action. *Dolan*, 794 F.3d at 294.

The Second Circuit has not yet articulated when verbal complaints constitute protected oral speech. However, some courts within the Second Circuit have determined that verbal or oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim.[11] *Gilliam v. Black*, WL 3716545, at *15 (D. Conn. Aug. 7, 2019) (citation omitted).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In order to allege causation, the inmate must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against

---

[11]However, "an inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)). Thus, district courts have concluded that First Amendment protection does not encompass an inmate's strident verbal challenge to authority, *see McIntosh v. United States*, No. 14-CV-7889 (KMK), 2016 WL 1274585, at *26-27 (S.D.N.Y. 2016), expressions of disrespect or insolence toward correction officers, *Young v. Ice*, No. 14-CV-1475, 2015 WL 471675, at *3 (N.D. Ohio Feb. 4, 2015), or confrontations or discussion of issues with staff, particularly when ordered not to do so. *Martin v. Hurley*, No. 14-CV-66, 2014 WL 7157336, at *2 (E.D. Mo. Dec. 15, 2014) (citing cases) ("Prisoners have no constitutionally protected right to confront staff and discuss issues with them, particularly when ordered not to do so.").

[him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*,

664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)).[12]

Lieutenant Colon

He alleges that Lieutenant Colon destroyed his property to retaliate against him[13] because

Colon is one of the victims in Jumpp's pending criminal case.[14]

Jumpp has not alleged any plausible protected speech or conduct that motivated Colon to

take retaliatory action against him. Generally, engaging in a criminal activity such as an assault

on a prison official is not protected speech or conduct. *See Barnes v. Cty. of Monroe*, 85 F. Supp.

3d 696, 731 (W.D.N.Y. 2015) (ruling that inmate could not assert First Amendment retaliation

claim against prison official whose family member may have been a victim of burglary by

plaintiff); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("physical assault is not by

any stretch of the imagination expressive conduct protected by the First Amendment.")

Accordingly, this claim of retaliation must be dismissed against Lieutenant Colon.

Warden Black

---

[12] "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

[13] He has also alleged that Colon refused to call the medical unit when he expressed that he was suicidal and hearing voices, that he had refused to provide him with an inhaler when he experienced chest tightness, and that Colon had threatened to shoot him and kill his family.

[14] In his prior action *Jumpp v. Thibodeau*, (wherein he sought to add his dental deliberate indifference claims now asserted in this case), Jumpp alleged that he had a pending felony assault charges and that four victims of the charged assaults were staff members at Corrigan, Dkt. 19-CV-1723 (KAD), IRO, ECF No. 6 at 3. Jumpp's prior action also alleged that a correction officer destroyed his property based on the fact he was being prosecuted for assaulting staff members at Corrigan. *Id.* at IRO, ECF No. 6 at p. 12-13. It appears likely, although it is not clear in the instant Amended Complaint, that Lieutenant Colon is a victim of these pending felony charges being prosecuted against Jumpp.

He asserts that Warden Black expressed that she had been instructed by Commissioner Cook to make sure Jumpp had a hard time at New Haven and she would not dismiss tickets against him because Jumpp had filed a lawsuit against Cook. Jumpp's allegations concerning Warden Black are too vague and conclusory to establish a First Amendment retaliation claim. Furthermore, a prison warden's failure to dismiss an inmate's disciplinary ticket upon verbal request is consistent with the Code of Penal Discipline set forth in Administrative Directive 9.5 and does not raise an inference of retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

Correction Officer Holness

Jumpp suggests that Correction Officer Holness failed to provide him with an inhaler based on her past history of retaliating against him. However, Jumpp has not alleged any information about Correction Officer Holness's prior retaliation or her motivation to retaliate against him in the past. The Court cannot find as plausible Jumpp's claim that Correction Officer Holness failed to provide him with an inhaler due to a retaliatory animus because it is premised on wholly conclusory allegations that are insufficient to state a claim of First Amendment retaliation.

Kitchen Supervisors Young and McClusky

He maintains that Kitchen Supervisors Young and McClusky retaliated against him because he complained about his tray portions. *See* ECF No. 18 at p. 19, ¶ 17

However, Jumpp has not alleged any causal connection between his complaint about the tray portions and Young and McClusky's conduct to provide him with meals containing onions. Specifically, Jumpp has not provided any allegations indicating that Kitchen Supervisors Young and McClusky were aware of Jumpp's complaint about tray portions so as to raise an inference

28

that they would be motivated to retaliate against him. *See Schlosser v. Manuel*, No. 3:19-CV-1444 (SRU), 2020 WL 127700, at *4 (D. Conn. Jan. 10, 2020) (dismissing retaliation claims where plaintiff had not alleged that defendant was aware that he had filed a grievance). These claims must be dismissed as not plausible.

### Deputy Warden Walker, District Administrator Erfe, and APRN Silva

Jumpp alleges Deputy Warden Walker and District Administrator Erfe stated that they would not correct staff failure to provide him medical treatment due to his prior legal actions. He alleges that APRN Silva indicated that she would not address his need for prescription medication in light of his lawsuit against her "workers;" that she instructed her staff not to provide him with his medication; discontinued his diet order regarding his food allergy; and instructed the kitchen staff that they could serve him food with tomatoes and onions.

Here, Jumpp has alleged facts suggesting that Deputy Warden Walker, District Administrator Erfe and APRN Silva refused to correct or even directed the staff failures to provide Jumpp with adequate medical care due to his prior legal actions against Commissioner Cook, Warden Black, or medical staff at New Haven. Additionally, he has alleged that APRN Silva was directly involved in preventing Jumpp from receiving his medications and appropriate meals. Prison staff's denial (or failure to prevent the denial) of an inmate's access to medical care or safe meals could cause that inmate to refrain from exercising his constitutional rights. For purpose of this initial review, the court concludes Jumpp has alleged plausible retaliation claims against Deputy Warden Walker, District Administrator Erfe and APRN Silva based on supervisory liability.

### Property Destruction

To the extent that Jumpp seeks to assert a separate Fourteenth Amendment claim for

destruction of property, this claim fails. A prisoner can state a due process claim for loss of property only if the state has not created adequate post-deprivation remedies. *See Edwards v. Erfe*, 588 Fed. App'x. 79, 80 (2d Cir. 2015) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)). Connecticut provides a remedy for lost or destroyed property. Under Connecticut General Statutes § 4-141, *et seq.*, a prisoner may bring a claim against the Connecticut Claims Commission unless there is another administrative remedy for his claim. Conn. Gen. Stat. § 4-142. The Department of Correction also has established an administrative remedy for lost or destroyed property. *See* Department of Correction Administrative Directive 9.6(16)(B), available at portal.ct.gov/DOC. Jumpp can utilize the administrative remedy and then proceed to the Claims Commission if his claim is denied. Because he has adequate state remedies, Jumpp's claim based on destruction of his property is not cognizable as a due process violation and the claim is dismissed.

## Deliberate Indifference to Dental Care at Corrigan

In *Jumpp v. Thibodeau*, this Court severed—as improperly joined under Federal Rule of Civil Procedure 20—Jumpp's claims of deliberate indifference to his dental needs from his action asserting deliberate indifference to his safety and medical needs and retaliation at Corrigan. 2019 WL 6828323, at *1-2. He was instructed that he could pursue his dental claims in a separate lawsuit. *Id.*

Jumpp's dental claims asserted now in this action against Simonow and Fletchette have also been improperly joined to his constitutional claims against staff at New Haven and must be severed in accordance with Federal Rules of Civil Procedure 20 and 21.

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with

respect to or arising out of the same transaction, occurrence, or series of transactions and

occurrences, and any question of law or fact common to all defendants will arise in the action."

Fed. R. Civ. P. 20(a)(2). "What will constitute the same transaction or occurrence under the first

prong of Rule 20(a) is approached on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor*

*Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted). As the Second

Circuit has observed in the Rule 13 context,[15] whether a counterclaim arises out of the same

transaction as the original claim depends upon the logical relationship between the claims and

whether the "essential facts of the various claims are so logically connected that considerations

of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v.*

*Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).

As in *Jumpp v. Thibodeau*, Jumpp's dental claims against Corrigan dental staff bear no

relation to his medical deliberate indifference claims concerning his seizures, blood pressure,

breathing issues, arm injury and food allergies against the New Haven staff, which form the

majority of his claims asserted in the Amended Complaint. No questions of law or fact exist that

are common to all claims and the dental claims and defendants are improperly joined in this

action in violation of Rule 20. *See Wilson v. McKenna*, No. 3:12-cv-1581(VLB), 2015 WL

1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must

be pursued in separate actions). Accordingly, the Court severs and dismisses the improperly

joined dental deliberate indifference claims against Simonow and Fletchette. *See* Fed. R. Civ. P.

---

[15]"In construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance
from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Barnhart v. Town of
Parma*, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (citation omitted).

21 (permitting the court to drop a party or sever a claim where the parties have been misjoined).

This ruling does not preclude Jumpp from asserting these claims in a separate action.

### Official Capacity Claims

Jumpp requests injunctive relief against the defendants in their official capacities.[16]

Jumpp may proceed against the defendants in their official capacities to the extent he

alleges an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563

U.S. 247, 254-55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). In *Ex parte Young*, 209

U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh

Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official

acting in an official capacity for prospective injunctive relief for continuing violations of federal

law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005).

"A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh

Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit*

*Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). However, this exception to Eleventh Amendment

immunity "does not permit judgments against state officers declaring that they violated federal

law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Federal courts can order prospective relief "in any civil action with respect to prison

conditions," provided it "extend[s] no further than necessary to correct the violation of the

Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a). Injunctive relief afforded

by a court must be narrowly tailored or proportional to the scope of the violation and extending

---

[16]  Any claims for money damages against the defendants, who are state employees, in their official capacities are dismissed as barred by the Eleventh Amendment. *See, e.g. Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). However, to obtain prospective injunctive relief, a plaintiff "cannot rely on past injury ... but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

Jumpp's Amended Complaint suggests a continuing violation of the Fourteenth Amendment in light of allegations that the supervisory staff at New Haven has expressed that they will not remedy any staff denial of Jumpp's access to medical care. Morevover, the Amended Complaint indicates that his food order to accommodate his food allergies has been terminated. Construing his complaint most broadly, Jumpp seeks injunctive orders to require the defendants to provide him with medication and medical treatment for his high blood pressure, seizures, breathing issues, and mental health, and meals that accommodate his food allergy to onions and tomatoes.

The court considers Jumpp's injunctive requests to seek appropriate relief for the asserted imminent physical harm he allegedly faces based on the defendants' Fourteenth Amendment deliberate indifference to Jumpp's medical care needs. However, Jumpp's injunctive relief claim may only proceed against defendants in their official capacities who plausibly have the authority to grant him the prospective relief. *See Vaughan v. Aldi*, No. 3:19-CV-00107 (JAM), 2019 WL 1922295, at *2 (D. Conn. Apr. 29, 2019); *Babyrev v. Lanotte*, No. 16 CIV. 5421 (ER), 2018 WL 388850, at *5 (S.D.N.Y. Jan. 11, 2018). Thus, the court will permit Jumpp's request for medical treatment (including any orders regarding his allergies) and medication to proceed against the defendants Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, District Administrator Erfe, and Deputy Warden Walker in their official capacities (as these defendants may plausibly provide Jumpp with his requested injunctive relief).

**ORDERS**[17]

The Court enters the following orders:

(1) Upon reconsideration the motion to proceed *in forma pauperis* is GRANTED.

(2) Jumpp's Fourteenth Amendment deliberate indifference to his medical needs claims may proceed against Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, Counselor Dixon, Correction Officer Makl, Correction Officer Mazzonna, Lieutenant Aponte, Correction Officer Holness, Nurse Carter, Nurse Richardson, Captain Russell, Lieutenant Colon, Correction Officer Loney, Lieutenant Cranshaw, Correction Officer Daniele; District Administrator Erfe, and Deputy Warden Walker in their individual capacities; his Fourteenth Amendment claims of deliberate indifference to his need for meals that accommodate his food allergies may proceed against Kitchen Supervisors Young and McClusky, Kitchen Head Manager Phillips, and APRN Silva in their individual capacities; his Fourteenth Amendment claim of excessive force may proceed against Correction Officer Mazzonna in his individual capacity; and his First Amendment retaliation claims may proceed against Deputy Warden Walker, District Administrator Erfe and APRN Silva in their individual capacities.

The Fourteenth Amendment claims for which injunctive relief is sought, to wit, an order that he receive his medication and medical treatment for his high blood pressure, seizures, breathing issues, and mental health, and that he receive meals to accommodate his food allergy, may proceed against Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, District Administrator Erfe, and Deputy Warden Walker in their official capacities.

---

[17] The court notes that, on its face, it seems unlikely that all of Jumpp's claims have been administratively exhausted as required under the Prison Litigation Reform Act of 1995. However, the Court does not undertake that analysis in the Initial Review Order and leaves to the Defendants to raise any such claim as they may deem appropriate.

The deliberate indifference to dental needs claims against defendants Simonow and Fletchette are severed and DISMISSED from this action. Jumpp may file these claims in a separate action.

All other claims are DISMISSED.

(3) The clerk shall verify the current work addresses for Nurse Supervisor Timiki Jackson, Nurse Supervisor Tiara Cheatham, APRN MaryEllen Silva, Counselor Dixon, Correction Officer Makl, Correction Officer Mazzonna, Lieutenant Aponte, Correction Officer Holness, Nurse Lynda Carter, Nurse Louise Marie Richardson, Captain Russell, Lieutenant Colon, Correction Officer Loney, Lieutenant Cranshaw, Correction Officer Daniele; District Administrator Erfe, Deputy Warden Walker, Kitchen Supervisors Michelle Young and McClusky and Kitchen Head Manager Michael Phillips at New Haven Correctional Center with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the Amended Complaint (ECF Nos. 18 & 19) to them at their confirmed addresses on or before **August 7, 2020** and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing.

If any defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) The clerk shall prepare a summons form and send an official capacity service packet, including the Amended Complaint (ECF Nos. 18 & 19), and this Initial Review Order on the United States Marshal Service. The U.S. Marshal is directed to effect service of the Amended Complaint on defendants Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva,

District Administrator Erfe, and Deputy Warden Walker in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, by **August 7, 2020** and file a return of service on or before **August 16, 2020**.

(5) Defendants shall file the response to the Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to him. If defendants choose to file an answer, defendants shall admit or deny the allegations and respond to the cognizable claims recited above. Defendants may also include any and all additional defenses permitted by the Federal Rules.

(6) The clerk shall send a courtesy copy of the Amended Complaint (ECF Nos. 18 & 19) and this Order to the DOC Office of Legal Affairs.

(7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed **by January 17, 20201**. Discovery requests need not be filed with the Court.

(8) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed by **February 16, 2021**.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not

36

enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(12) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. Plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendant's counsel by regular mail.

                    __/s/_____
                    Kari A. Dooley
                    United States District Judge


        **SO ORDERED** this 20th day of July 2020, at Bridgeport, Connecticut.