UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JUNIOR JUMPP,                          :
     Plaintiff,                    :
                                   :
v.                                     :     3:20cv138 (KAD)
                                   :
NANCY SIMONOW,  et. al,                :
     Defendants.                   :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On January 31, 2020, the plaintiff, Junior Jumpp ("Jumpp"), a pretrial detainee who was

formerly held in the custody of the Department of Correction ("DOC") at New Haven

Correctional Center ("New Haven"), filed this civil rights action pursuant to title 42 U.S.C. §

1983 against District Administrator Scott Erfe, Commissioner Rollin Cook, and twenty-three

individual DOC employees. *See* Initial Review Order ("IRO")(ECF No. 23).

On initial review[1], the Court permitted Jumpp's Fourteenth Amendment deliberate

indifference to medical needs claims to proceed against: (1) Nurse Supervisor Jackson, Nurse

Richardson and APRN Silva for failure to provide him treatment and medication for his seizure

disorder and high blood pressure; (2) Counselor Dixon, Correction Officer Makl and Correction

Officer Mazzonna for deliberate indifference to his need for medical staff attention for his

seizures; (3) Lieutenant Aponte, Lieutenant Colon, Correction Officer Holness, Counselor

Dixon, APRN Silva, and Nurses Carter and Richardson for deliberate indifference to his need for

an inhaler while he was experiencing breathing issues and chest tightness; (4) Captain Russell,

Lieutenant Colon, Correction Officer Loney, Lieutenant Cranshaw, Correction Officer Daniele,

and Nurse Supervisor Jackson for deliberate indifference to his need for mental health care and

---

[1] The Initial Review Order considered Jumpp's Second Amended Complaint which was filed on May 4, 2020 and
included allegations which post-dated the filing of the original complaint.

medical attention after he expressed suicidal thoughts, intention to commit self-harm and then allegedly swallowed batteries and a sharp object; (5) Correction Officer Mazzonna and Nurse Richardson for deliberate indifference to his need for medical attention for his arm; (6) Kitchen Supervisors Young and McClusky and APRN Silva for deliberate indifference to his food allergy; and (7) District Administrator Erfe, Deputy Warden Walker, Nurse Supervisor Jackson, Nurse Supervisor Cheatham, APRN Silva, and Kitchen Head Manager Phillip for failure to remedy staff failures regarding his medical care or food allergy. The Court also permitted Jumpp's Fourteenth Amendment excessive use of force claim against Correction Officer Mazzonna and his First Amendment retaliation claim against Deputy Warden Walker, District Administrator Erfe and APRN Silva. In addition, the Court permitted official capacity claims to the extent Jumpp sought injunctive relief regarding his medical treatment and medication and his need for accommodation for his food allergy. *See* IRO (ECF No. 23).[2]

On April 28, 2021, all Defendants filed a Motion for Summary Judgment on the basis of Jumpp's failure to exhaust his administrative remedies and on the merits of his claims. (ECF No. 93). Under District of Connecticut Local Rule 7(a)(2), Jumpp's opposition to the motion for summary judgment was due within 21 days of the filing of Defendants' motion for summary judgment. To date, Jumpp has not filed a timely opposition. Nor has he sought an extension of time within which to do so.[3]

---

[2] Jumpp's official capacity claims are now moot because Jumpp is no longer incarcerated within DOC. *Santiago v. Annucci*, No. 20-CV-4530 (KMK), 2021 WL 4392487, at *8 (S.D.N.Y. Sept. 24, 2021) (dismissing claim for injunctive relief where plaintiff had been released from prison); *Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (explaining that "[w]here a prisoner has been *released* from prison, his [or her] claims for injunctive relief based on the conditions of his [or her] incarceration must be dismissed as moot").

[3] Defendants provided Jumpp with a notice in compliance with Local Rule of Civil Procedure 56(b) that informed him that judgment may be entered against him on his claims if he did not "file papers as required by Rule 56 of the Federal Rules of Civil Procedure and Rule 56 of the Local Rules of Civil Procedure" and if the defendants' motion shows the defendants' entitlement to entry of judgment as a matter of law. Notice to *Pro Se Litigant* (ECF No. 93-14). He was therein informed that he should review "very carefully" the copies of the attached rules.

After review and consideration of Jumpp's allegations, Defendants' memorandum of law, Rule 56(a)1 statement of facts, and all evidentiary materials submitted, the Defendants' Motion for Summary Judgment is GRANTED.

**STANDARD OF REVIEW**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense...." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as

would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**FACTS**

The court provides the following relevant facts[4] taken from Defendants' Local Rule 56(a)1 Statement and its supporting exhibits.[5] (ECF No. 93-13) ("Defs.' Rule 56(a)). The Court assumes familiarity with the detailed recitation of Jumpp's factual allegations in the Court's Initial Review Order (ECF No. 23).

Jumpp first entered DOC custody on November 16, 2006. Defs.' Rule 56(a) at ¶ 1. He was readmitted on December 20, 2017 as a pretrial detainiee facing multiple charges. *Id.* at ¶ 2.

---

[4] The Court includes herein primarily the facts relevant to Jumpp's medical indifference claims arising out of his need for medications which were, as discussed *infra.,* properly exhausted.   As the Court concludes that the remaining plethora of claims were not properly exhausted, a detailed recitation of them is unnecessary.   The Court notes however that they are detailed in the Initial Review Order at ECF No. 23.

[5] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Defendants informed Jumpp of this requirement in their Notice to *Pro Se* Litigant. (ECF No. 93-14). Because Jumpp has not filed a response to Defendants' statement of facts in compliance with Local Rule 56(a)2, Defendants' Rule 56(a)1 statement of facts may be deemed admitted where supported by the evidence. *See Small v. Clements*, No. 3:18-CV-1731 (KAD), 2019 WL 5727388, at *1, n.1 (D. Conn. Nov. 5, 2019); *Wu v. Nat'l Geospatial Intel. Agency*, No. 3:14CV1603 (DJS), 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017) (noting in context of *pro se* Plaintiff's failure to submit a Local Rule 56(a)2 statement, that "*pro se* parties are not excused from abiding by the Federal Rules of Civil Procedure.") (citation omitted).

Jumpp was housed at New Haven Correctional Institution ("NHCC") from November 21, 2019 through December 14, 2019; at Yale New Haven Hospital from December 14 to December 16, 2019; at NHCC from December 16, 2019 through June 14, 2020; and at Bridgeport Correctional Center ("BCC") from June 14 to June 17, 2020. *Id.* at ¶¶ 4-5, Defs.' ex. 1, Deveau declar., ex. B (ECF No. 93-2 at 10). On June 17, 2020, Jumpp was transferred from BCC to Corrigan-Radgowski Correctional Center ("CRCC"). Defs.' Rule 56(a) at ¶ 6. He was subsequently released from DOC custody following a court appearance on April 27, 2021. *Id.* at ¶ 7.

While in DOC custody, Jumpp received medical, mental health and dental care that is recorded in a medical chart with his name and inmate number. *Id.* at ¶¶ 8-9. He received medical treatment for issues concerning, *inter alia*, non-cardiac chest pain, obstructive sleep apnea, hypertension, asthma, various dental conditions, obesity, and anti-social personality disorder. *Id.* at ¶ 9. He was prescribed with Hydrochlorothiazide (one table by mouth daily),[6] Aspirin (one tablet by mouth daily), Flovent (two puffs every twelve hours),[7] Ventolin (1-2 puffs every four to six hours as needed),[8] Lisinopril (one tablet QD (per day)),[9] Pantoprazole (one table by mouth daily),[10] and Atorvastatin (one table by mouth at bedtime).[11] *Id.* at ¶ 10; *see* Defs.' ex. 7

---

[6] Hydrochlorothiazide is a thiazide diuretic (water pill) that helps prevent the body from absorbing too much salt, which can cause fluid retention. https://www.drugs.com/hctz.html.

[7] Flovent (fluticasone) is a corticosteroid that prevents the release of substances in the body that cause inflammation and is used to prevent asthma attacks. https://www.drugs.com/flovent.html.

[8] Ventolin (albuterol) is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs. https://www.drugs.com/ventolin.html.

[9] Lisinopril is used to treat high blood pressure, which helps prevent strokes, heart attacks, and kidney problems. https://www.webmd.com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details.

[10] Pantoprazole is a proton pump inhibitor that decreases the amount of acid produced in the stomach. https://www.drugs.com/pantoprazole.html.

[11] Atorvastatin is used together with diet to lower blood levels of "bad" cholesterol (low-density

(medical record) (ECF No. 94 at 633). Jumpp has been identified as having allergies to Bactrim, onions and tomatoes. Defs.' Rule 56(a)1 at ¶ 11.

The medical record reflects that Jumpp was evaluated by a licensed clinical social worker on December 13, 2019; she noted that he had been referred because he had threatened to act out in order to be sent to UCONN for the weekend in the event that he were not permitted to see mental health staff; and that Jumpp made complaints about being taken off of his mental health medication and his need for a single cell. *Id.* at ¶ 87.[12]

The 672-page medical record indicates the numerous administrations of Jumpp's medication between December 2019 through February 13, 2020. *See* Defs.' ex. 7 (ECF No. 94). It also contains notes recording Jumpp's several refusals during this period to take medications, including aspirin, Lisinopril, Hydrochlorothiazide, Pantoprazole, and Flovent. *See id.* at 656-670 (Dec. 1-3, 2019); 601-4 (Dec. 12); 592-595 (Dec. 13); 542-558 (Dec. 17-20); 527-530 (Dec. 23); 497-501 (Dec. 27); 420-422 (Dec. 30); 400-407 (Jan. 1-2, 2020);   -391-394 (Jan 3); 377-380 (Jan 4); 354-369 (Jan 5-7, includes Atorvastatin); 336-347 (Jan 8-9); 318-321(Jan 11); 264-268 (Jan 15); 218-222 (Jan 18); 150-154 (Jan. 27); 100 (Feb. 2, 2020 Flovent).

After Jumpp saw Nurse Jackson about a nosebleed on December 27, 2019, she noted the following:

> Inmate has been non-compl[ian]t with hypertensive medications and also refused his [AM] meds this morning. Blood pressures checked in both arms (R) 165/105 and (L) 175/120 HR 88 RR 18. No further clinically signs to[] report. Inmate received a one (1) time dose of Usinpril 40mg and HCTZ 50mg PO. Took as provided per in-house medical

---

lipoprotein, or LDL), to increase levels of "good" cholesterol (high-density lipoprotein, or HDL), and to lower triglycerides (a type of fat in the blood). https://www.drugs.com/atorvastatin.html.

[12]  On December 14, 2019, Plaintiff was charged with violations of institutional rules for interfering with safety and security (2) and self-mutilation after he informed custody that he required an inhaler and that he had swallowed a foreign object, for which condition he was immediately transferred to Yale New Haven Hospital for observation and treatment. *Id.* at ¶ 12.

> provider Silva. Inmate to have blood pressure recheck to monitor the effects of the blood
> pressure medica[t]ion provided by this provider.

*Id.* at 495. During a follow-up on that day, Jumpp's blood pressure was shown to be down to

100/66. Defs.' Rule 56(a) at ¶ 16. Medication of Atorvastatin was marked as having been

administered at 21:48.25 (9:48.25 PM). Defs.' ex. 7 (ECF No. 94 at 493-494).

On December 29, 2019, LPN Carter arrived at Jumpp's housing unit in response to his

request for access to his inhaler. A medical entry by Carter for that day states:

> At 2:05 the CO from Fox housing unit called stating that Inmate Jump needed his inhaler.
> This nurse went to Fox housing unit to Give inhaler to Inmate per PRN order. Inmate
> stood in dayroom while the CO opened dayroom door so inmate could come to nurse to
> use the inhaler. Inmate Jump continued to Laugh and steer at this nurse along with other
> inmates[.] This nurse motioned Inmate to come get his inhaler at which the inmate
> continued to laugh and steer and did not move to come get his inhaler. This nurse
> informed the 2 CO's that were witnessing Jump that she was only staying 1 min longer.[]
> Inmate Jump continued to laugh and steer at this nurse. Inmate refused and nurse left the
> unit.

Defs.' Rule 56(a) at ¶ 78.

On December 31, 2019, Jumpp's blood pressure was recorded as 122/78. *Id.* at ¶ 80.

On January 4, 2020, kitchen staff reported to medical staff that they were "well aware" of

Jumpp's allergies, that there was a correct order on file, that his tray is inspected prior to his

"being issued for food delivery" to ensure correct preparation, and that the food which Jumpp

had consumed on January 2, 2020 "did not contain any of the listed allergents." *Id.* at ¶ 82.

On January 3, 2020, Jumpp saw Nurse Jackson for chest tightness. Defs. ex. 7 (ECF No.

94 at 387). Her medical notes states that he accused her of "bullying" him but that she "will

continue provide medical treatment at all times in a professional manner." *Id.* She observed that

Jumpp "continues to refuse his cardiac medications in the morning" and that she would give him

his missed morning medications "with a sip of water" and "continue to monitor and update." *Id.*

at 389.

A medical note dated January 6, 2020 by Nurse Mia Kendall states:

> IM Jumpp was escorted to medical at approximately 9am by C/O Medina. IM requested to take his medication prior to his URC appointment today. This writer pulled his medication to administer. Upon attempting to administer the medication IM Jumpp refused to take medication. IM Jumpp gave no valid explanation. This writer and CN Richardson explained the possible complications from refusing to take medication. IM Jumpp understood and replied he may pass out if he does not take them but still refused, CN Draungh was walking by and CN Richardson asked her if she would medicate him now. IM Jumpp took the medication and his Flovent inhaler. IM Jumpp complained that his inhaler was out. I informed IM Jumpp that his Flovent inhaler showed that there are 124 pumps left.

*Id.* at 361.

On January 7, 2020, Nurse Jackson assessed Jumpp for a complaint of chest wall tightness. Defs.' Rule 56(a) at ¶ 83. She noted the following:

> Presented to housing unit with inmate requesting inhaler. Upon arrival to unit inmate decided to declar chest wall tightness. Inmate continue[s] to point to left shou[l]der region with no obvious distress. Inmate continues to refuse [AM] medications.

*Id.* at ¶ 84.

On January 12, 2020, the kitchen staff informed medical staff that Jumpp had received the same oatmeal as the other inmates in the facility; and on January 16, 2020, Phillips informed the medical staff that the chicken patty served to Jumpp did not contain onions, onion powder or onion derivative.[13] *Id.* at ¶¶ 85-86.

On February 3, 2020, Jumpp was evaluated by Defendant RN Richardson in medical unit for a nosebleed; after the examination was completed, Jumpp was instructed to return to his housing unit. *Id.* at ¶ 88.

On February 7, 2020, Nurse Cheatham updated Jumpp's prescriptions. Defs.' ex. 7 (ECF No. 94 at 51-53) (noting chart maintenance).

---

[13] A medical record dated January 16, 2020 states that Jumpp claimed, but had no signs of, an "'anaphylactic reaction" to the onion powder that he alleged was sprinkled on his chicken patty at lunch. *Id.* at ¶ 86.

**DISCUSSION**

All of Jumpp's claims stem from events occurring between December 2019 and May 2020.  Defendants maintain that Jumpp failed to exhaust his remedies for his constitutional claims against the custody defendants under Administrative Directive 9.6, and for his constitutional claims against medical staff under Administrative Directive 8.9. Defs.' Mem. at 17, 22. They also argue that Jumpp cannot prevail on the merits of his claims as a matter of law. *Id.* at 22-37.

**Exhaustion under the Prison Litigation Reform Act ("PLRA")**

The PRLA, which governs actions brought by prison inmates, requires prisoner to exhaust administrative remedies prior to filing a federal lawsuit regarding prison conditions.[14]  42 U.S.C. 42 US.C. § 1997e(a).

Failure to exhaust is an affirmative defense under the PLRA, 42 U.S.C. § 1997e; *Jones v. Bock*, 549 U.S. 199, 217 (2007); and a defendant bears the burden to prove that an inmate did not exhaust his or her remedies prior to filing the action in court. *See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment.").[15]

Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534 U.S.

---

[14]  Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

[15]  Although a defendant bears the burden on this affirmative defense at all times, the plaintiff may still have to adduce evidence in order to defeat a motion for summary judgment. *See Hudson v. Kirkey*, No. 920CV0581LEKDJS, 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once defendant introduces evidence of a functional grievance system, plaintiff could not survive summary judgment without submitting competent evidence to indicate unavailability). While it is Defendants' burden to establish that Jumpp failed to meet the exhaustion requirement, Jumpp bears the burden of demonstrating that such a process was unavailable. *Brooks v. Mullen*, No. 14-CV-6690-FPG, 2020 WL 6158614, at *5 (W.D.N.Y. Oct. 21, 2020) (citations omitted).

516, 532 (2002), and it requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court. *See Woodford*, 548 U.S. at 95. Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83–84).

The exhaustion requirement, however, may be excused when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 136 S. Ct. 1850, 1858-59 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has identified three circumstances under which an inmate need not exhaust the administrative procedure: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk*

*Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

It is not sufficient for a plaintiff to exhaust his administrative remedies after filing his complaint; a plaintiff must exhaust his administrative remedies prior to filing the action in federal court. *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds*, *Porter*, 534 U.S. 516; *Gulley v. Bujnicki*, No. 3:19-CV-903 (SRU), 2019 WL 2603536, at *3 (D. Conn. June 25, 2019).

Administrative Remedies Under Administrative Directive 9.6[16]

Administrative Directive 9.6 "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority[.]" A.D. 9.6(1). Jumpp was obligated to exhaust his administrative remedies for his Fourteenth and First Amendment claims against custody staff under Administrative Directive 9.6 prior to filing this action. *See Cosby v. Tawana*, No. 3:19-CV-401 (MPS), 2020 WL 4284561, at *4 (D. Conn. July 27, 2020) (plaintiff's claims of deliberate indifference to medical needs by custody staff is subject to exhaustion under Administrative Directive 9.6); *see also Wilson v. McKenna*, 661 F. App'x 750, 753 (2d Cir. 2016) (summary order) (affirming district court's dismissal based on inmate's failure to exhaust his claim against correction officer for deliberate indifference to medical needs under Administrative Directive 9.6).

Administrative Directive 9.6(6) requires an aggrieved inmate to first seek informal resolution prior to filing a grievance. A.D. 9.6(6)(A). It provides that "the inmate shall submit a written request via CN 9601, Inmate Request Form" in the event that "the verbal option does not resolve the issue." *Id.* Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (CN 9601) with the grievance (CN 9602) or

---

[16]  Defendants submitted the relevant version of Administrative Directive 9.6 as Exhibit 2 (ECF No. 93-3).

an inmate must explain its absence.

The Level-1 Grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the Grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. A.D. 9.6(6)(C). The Unit Administrator must respond in writing to the Level-1 Grievance within thirty business days of his or her receipt of the Grievance. *See* A.D. 9.6(6)(I). The inmate may appeal the disposition of the Level-1 Grievance by the Unit Administrator or the Unit Administrator's failure to dispose of the grievance in a timely manner to Level 2. A.D. 9.6(6)(G), (I) & (K). A grievance returned without disposition due to a failure to comply with procedural requirements of Administrative Directive 9.6 may not be appealed. *See* A.D. 9.6(6)(G).

A Level-2 Appeal of a disposition of a Level-1 Grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level-1 Grievance. *See* A.D. 9.6(6)(K). The Level-2 Appeal of the Unit Administrator's failure to dispose of the Level-1 Grievance in a timely manner must be filed within 65 days from the date the Level-1 Grievance was filed by the inmate. *See* A.D. 9.6(6)(M).

Level-2 Appeals of inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. A.D. 9.6(6)(K). The District Administrator is required to respond to the Level-2 Appeal within thirty business days of receipt of the appeal. *See id.*

Level-3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure or Level-2 Appeals to which there has been an untimely response by the District Administrator. A.D. 9.6(6)(L). A Leve1-3 appeal must be filed within five calendar days from the inmate's receipt of the decision on the Level-2 Appeal. *See id.* A Level-3 Appeal of the

12

District Administrator's failure to dispose of the Level-2 Appeal in a timely manner must be filed within 35 days of the filing of the Level-2 appeal. A.D. 9.6(6)(M). A Level-3 Appeal is reviewed by the Commissioner of Correction or his or her designee. A.D. 9.6(6)(L).

Here, Defendants have submitted evidence demonstrating that Jumpp's remedies under Administrative Directive 9.6 were available and that he failed to satisfy all of the steps under Directive 9.6 for exhaustion prior to filing this action.

The following facts from Defendants' Rule 56(a)1 statement are admitted as undisputed as they are properly substantiated by the record evidence.[17]

On December 23, 2019, Jumpp filed three Level-1 Grievances. He filed a Level-1 Grievance naming Defendant Phillips as failing to provide ample food on his tray and tampering with his food tray due to his special dietary needs. Defs. Rule 56(a) at ¶ 34. This Level-1 Grievance was rejected for the stated reason of "no evidence to support [Jumpp's] claims" as the kitchen had "adhered to the special diet approved by medical for your food allergies." *Id.* at ¶ 35. There is no record of a Level-2 Grievance Appeal for this Level-1 Grievance. *Id.* at ¶ 36.

He filed another Level-1 Grievance naming Defendant Russell and complaining about untimely legal mail. *Id.* at ¶ 38. This Level-1 Grievance was rejected for the stated reason that "no evidence" supported his claim that he had received mail in "an untimely manner as a result of NHCC's mailroom staff." *Id.* at ¶ 39. There is no record of a Level-2 Grievance Appeal for this Level-1 Grievance. *Id.* at ¶ 40.

He also filed a Level-1 Grievance against Defendant Dixon for denying his right to access to the courts and failing to provide him with legal calls, a typewriter, review of his master

---

[17] In her amended declaration, ECF No. 95, Administrative Remedies Coordinator Anjeanette McKenzie avers she researched Jumpp's grievance filings that were recorded as having been received from December 2019 and February 2020. (ECF No. 95). She attached to her original declaration the relevant grievances filed under Administrative Directive 9.6. (ECF No. 93-4 at 6-14).

file, and copies. *Id.* at ¶ 41. This request was rejected due to "no evidence to support [his] claim that CC Dixon ha[d] denied [him] access to courts, legal call, typewriter usage, master file review, and copies." *Id.* at ¶ 42. There is no record of a Level-2 Grievance Appeal for this Level-1 Grievance. *Id.* at ¶ 43.

This record reveals that Jumpp failed to file an appeal of his Level-1 Grievance for his complaints about indifference to his dietary needs and that he failed to file any grievances relevant to his remaining Fourteenth and First Amendment claims against custody staff. There is also no suggestion that Jumpp's administrative remedies under Administrative Directive 9.6 were unavailable to him so as to excuse the exhaustion requirement as contemplated by *Ross. See Otero v. Purdy*, No. 3:19-CV-01688 (VLB), 2021 WL 4263363, at *10 (D. Conn. Sept. 20, 2021) (noting plaintiff's prior grievance filing demonstrated availability of administrative remedies). Thus, the Court concludes that Defendants have met their burden of demonstrating that there is no genuine issue of material regarding Jumpp's failure to exhaust his remedies under Administrative Directive 9.6.

The Court grants the motion for summary judgment in Defendants' favor on his claims against all custody staff.

<u>Exhaustion of Administrative Remedies Under Administrative Directive 8.9[18]</u>

DOC Administrative Directive 8.9 (entitled Administrative Remedy for Health Services). provides for two types of "Health Services Review": (1) Diagnosis and treatment, which includes a review of a decision not to provide treatment; and (2) Review of an Administrative Issue,

---

[18] Defendants have submitted the relevant version of Administrative Directive as Exhibit 4 (ECF No. 93-5).

which addresses concerns of "a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." A.D. 8.9(9).

Pursuant to Section 10 of Administrative Directive 8.9, both types of grievances require an inmate to seek informal resolution of "the issue face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." 8.9(10). According to Section 10, a response to the inmate request should be provided within fifteen calendar days from receipt of a written request. *Id.*

An inmate who is dissatisfied with a diagnosis or treatment may apply for a Health Services Review "if the informal resolution via inmate request was unsuccessful." A.D. 8.9(11). The inmate must check the Diagnosis/Treatment box on the form (CN 9602), explain concisely the cause of dissatisfaction, and deposit the form in the Health Services Remedies/Review box. *Id.* Upon receipt of a CN 9602, the Health Services Review Coordinator shall schedule a Health Services Review Appointment with the appropriate health care provider. A.D. 8.9(11)(A). "If the physician decides that the existing diagnosis or treatment is appropriate, the inmate shall have exhausted the health services review." *Id.* "The physician shall notify the inmate of the decision, in writing, within ten business days by indicating 'No Further Action' in the disposition field of CN 9602, Inmate Administrative Remedy Form." *Id.* "If the physician decides that a different diagnosis or treatment is warranted, he/she may either (1) act on his/her decision; or, (2) refer the case to the [URC] for authorization by indicating 'Change of Treatment' or 'Referred to URC' as appropriate[.]" A.D. 8.9(11)(B).

An inmate may request review of an Administrative Issue by checking the box marked "All Other Health Care Issues" on the Health Services Review form (CN 9602); the inmate must provide a concise statement of what the inmate believes to be wrong and how the inmate has

been affected, and the inmate must deposit the form in the Health Services box. A.D. 8.9 (12). This request for review shall be evaluated by a Health Services Review Coordinator within thirty days. A.D. 8.9 (12)(A). If the inmate is dissatisfied with the response, the inmate may appeal the decision within ten business days. A.D. 8.9 (12)(B). The appeal is decided and responded to by the designated facility health services director or designee within fifteen days. A.D. 8.9 (12)(C). For all issues relating to compliance with existing standards, this review is final, and the inmate shall have exhausted the requisite Health Services Review process. *Id.* If the matter "relates to a health service policy of the Department, the inmate may appeal to the DOC Director of Health Services" within ten business days from the receipt of the response. A.D. 8.9 (12)(D). The Director has thirty days to respond. A.D. 8.9 (12)(E). Upon receipt of this decision, the inmate shall have exhausted the Health Services Review for an Administrative Issue. *Id.*

Jumpp was required to exhaust his administrative remedies under Administrative Directive 8.9 for his claims concerning medical staff failure to provide him treatment and medication for his seizure disorder and high blood pressure; indifference to his need for an inhaler while he was experiencing breathing issues and chest tightness; indifference to his need for mental health care and medical attention after he expressed suicidal thoughts and intention to commit self-harm to Nurse Jackson and then allegedly swallowed batteries and a sharp object; indifference to his need for medical attention for his arm; indifference to his food allergy; indifference to staff failures regarding his medical care; and retaliatory conduct. *See Taylor v. Jepsen*, No. 3:17CV1972 (AWT), 2020 WL 6703189, at *8 (D. Conn. Oct. 28, 2020) (considering whether filings under Directive 8.9 constituted exhaustion of either Fourteenth Amendment or First Amendment retaliation claims).

16

The following facts from Defendants' Rule 56(a)1 statement are admitted as undisputed as they are properly substantiated by the record evidence.[19]

On December 25, 2019, Jumpp filed several medical grievances. He filed a Health Services Review concerning a request to obtain medical records that had been ignored. Defs.' Rule 56(a) at ¶ 55. This medical grievance was marked as compromised and copy of the grievance was forwarded to a medical records specialist and Correctional Head Nurses. *Id.* at ¶ 56. Defendant Cheatham responded to the same grievance and asked Jumpp to "please specify the information you are looking for so that it can be gathered. Once that information is received then you will be called down for the review." *Id.* at ¶ 58. There is no evidence that Jumpp filed an appeal or pursued any other action regarding this matter. *Id.* at ¶¶ 57, 59.

Jumpp also filed a Health Services Review about untimely or inadequate mental health treatment despite multiple requests mental health staff seeking help because he was experiencing depression and hearing voices even after he had been sent to a hospital on December 14, 2019 due to hearing voices telling him to commit suicide. *Id.* at ¶ 61; *see* Defs.' ex. 5 at p. 10 (ECF No. 93-6). This medical grievance was deemed compromised and a copy was sent to mental health provider, Dr. Fletcher, assigned to NHCC. *Id.* at ¶ 62.

He filed another Health Services Review complaining that he had been denied his blood pressure medications and that Nursing Supervisors Jackson and Cheatham had instructed their

---

[19] In his declaration, Regional Chief Operating Officer Michael Green for the NHCC Health Unit avers that he researched Jumpp's Health Services Reviews (also referred to as a medical or health grievances) filed during the period from December 2020 (sic) through April 2020; he avers to the facts detailed in this Ruling about Jumpp's Health Services Remedies during that time. Defs.' ex. 5 at ¶¶ 1-8 (ECF No. 93-6). He also avers that Jumpp filed a health or medical grievance on April 4, 2019 identified as number 21291, but a copy of this medical grievance could not be retrieved. *Id.* at ¶ 7. The attached administrative remedies log indicates that this grievance was filed at Hartford Correctional Center and was rejected. *Id.* at ex. A. Because this grievance was filed approximately eight months prior to the first alleged conduct giving rise to the claims in this action, *see* IRO at 8-15, this grievance is not relevant to the consideration of whether Jumpp exhausted his administrative remedies for his claims in this matter.

nurses not to provide him with his medications. *Id.* at ¶¶ 64-65. This medical grievance was also deemed compromised and sent to Nurses Jackson and Cheatham. *Id.* at ¶ 66.

Finally, he filed a Health Services Review complaining that Jackson and Cheatham had failed to provide a timely response and information for his Freedom of Information Act request. *Id.* at ¶ 68. This medical grievance was also deemed compromised and sent to Nurses Jackson and Cheatham. *Id.* at ¶ 69.

Defendants argue that Jumpp has not exhausted his remedies for any of his claims. *See* Defs.' Mem. at 22. However, it appears that Jumpp did file Health Services Reviews regarding untimely or inadequate mental health treatment and about denial of his blood pressure medications. Notwithstanding, Defendants assert that Jumpp failed to appeal the compromised dispositions of these grievances, although Defendants acknowledge that Administrative Directive "is silent" as to any such requirement. *Id.*

One purpose of the PLRA is to afford inmates and corrections officials an opportunity to address complaints internally before engaging in federal litigation. *Woodford*, 548 U.S. at 93–94. "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). As such, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Jones*, 549 U.S. at 218.

Drawing all available inferences in Jumpp's favor, the Court concludes that Jumpp has exhausted his remedies under Administrative Directive 8.9 with respect to his claim that defendants were deliberately indifferent to his need for his blood pressure or seizure medication.

His Health Services Review dated December 25, 2019 about his lack of mental health treatment predates his claim concerning Nurse Jackson's failure on May 12, 2020 to provide him with medical and mental health attention after he informed her about his suicidal thoughts and intent to commit self-harm and then swallowed batteries and a sharp metal object. *See* IRO (ECF No. 23 at 19).   In fact, Jumpp does not bring any claims in this lawsuit against medical personnel related to the December 2019 Health Services Review. His claims related to the events surrounding the Health Services Review were advanced against custody personnel only. And it is axiomatic that this grievance about his depression and hearing voices in December 2019 does not suffice to alert DOC officials about the nature of this complaint against Nurse Jackson's conduct more than four months later.

As to Jumpp's other claims of medical indifference and retaliation by medical staff, the Court concludes that Defendants have substantiated their argument that Jumpp failed to exhaust his administrative remedies under Directive 8.9, and the record raises no suggestion that Jumpp's remedies were not available as contemplated by *Ross*.

Accordingly, the Court the motion for summary judgment is granted in Defendants' favor against all named medical staff arising out of alleged indifference to his need for an inhaler; his need for medical and mental health care after he allegedly swallowed batteries and a sharp object on May 12, 2020; his need for medical attention for his arm; indifference to his food allergy; and indifference to staff failures regarding his medical care. In addition, the the motion for summary judgment is granted as to the First Amendment retaliation claim against APRN Silva.

The Court next considers the merits of Jumpp's claim that defendants were deliberately indifferent to his need for medication for his blood pressure and/or seizure disorder.[20]

**Fourteenth Amendment Deliberate Indifference**

Jumpp was a pretrial detainee at the time relevant to this action. A pretrial detainee's claims involving alleged indifference to medical needs or unsafe conditions of confinement are considered under the Due Process Clause of the Fourteenth *See Darnell v. Pineiro*, 849 F.3d 17, 29-34 & n.9 (2d Cir. 2017); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 717-18 (S.D.N.Y. 2017).

To state a claim under the Fourteenth Amendment for deliberate indifference to health and safety, a plaintiff must allege facts to satisfy two prongs: (1) an "objective prong" showing that the plaintiff's condition of confinement posed a unreasonable risk of serious harm to the plaintiff, and (2) a "*mens rea* prong" showing that the state actor's conduct amounts to deliberate indifference to that objectively serious risk of harm. *See Darnell*, 849 F. 3d at 29; *Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019).

Under the objective prong, a detainee must allege that "the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health ... which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (internal quotation marks and citations omitted). A district court evaluates the conditions to which the detainee was exposed in the context of contemporary standards of decency and addresses, *inter alia*, whether the detainee has been deprived of basic human needs including, for example, food, clothing, shelter, medical care, and reasonable safety, or has been subjected to an unreasonable risk of serious harm to his future health. *Id.* (internal quotation marks and citations omitted).

---

[20] The Court construes Jumpp's reference to his blood pressure medications to encompass his seizure disorder medications.

Under the Fourteenth Amendment analysis, the "serious medical need standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86. To determine whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, the court should "consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects the individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86. "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Id.* at 86.

Relevant to the second or "*mens rea*" factor, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At the same time, "negligence ... does not, without more, engender a constitutional claim." *Sanders v. Laplante*, No. 3:19-cv-01151 (CSH), 2019 WL 5538118, at *3 (D. Conn. Oct. 25, 2019); *see also Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.").

Jumpp has alleged deliberate indifference on the grounds that he was denied medication for his high blood pressure and/or seizure disorder and that Jackson and Cheatham instructed the medical staff not to provide him with such medications. *See* Second Am. Compl. (ECF No. 18 at p. 13 ¶ 1, p. 15   ¶ 5, p. 17 ¶ 12). Even assuming that Jumpp's condition satisfies the objective

element of the analysis, the record includes no evidence whatsoever that any defendant acted to deprive him of his medication, at all, let alone with the requisite *mens rea* of deliberate indifference to the harms such conduct might cause. The 627-page medical record substantiates that Jumpp was administered his necessary medications except on those occasions when he refused to take them. And Jumpp has offered no evidence to the contrary.

Thus, after review of the extensive medical record submitted, the Court concludes that there is no inference to be drawn or direct evidence that any defendant sought to prevent the administration of Jumpp's medication or acted with deliberate indifference to his needs for blood pressure and/or seizure medications. *See Perry v. Furey*, No. 3:18CV1709 (KAD), 2020 WL 59941, at *5 (D. Conn. Jan. 6, 2020) (noting that plaintiff's personal opinion about inadequacy of medical treatment "fails to account for his own role in the treatment he did and did not receive and does not create a genuine issue of material fact in any event.")

Based on the record evidence, no reasonable jury could determine that Jumpp's Fourteenth Amendment rights were violated due to any defendant's deliberate indifference to his need for blood pressure and/or seizure medications.   Accordingly, the motion for summary judgment is granted in defendants' favor.

## CONCLUSION

 For the foregoing reasons, the Motion for Summary Judgment [ECF No. 93] is GRANTED. The clerk is instructed to enter judgment in Defendants' favor and to close this case.

**SO ORDERED** this 19th day of October 2021, at Bridgeport, Connecticut.


      ___/s/_____
      Kari A. Dooley
      United States District Judge